Frank BARNEY, Plaintiff-Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.

No. 83–1641.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 10, 1984.

Decided Sept. 19, 1984.

John C. Leaming (argued), Bay City, Mich., for plaintiff-appellant.

Leonard R. Gilman, U.S. Atty., Patricia G. Reeves, Ellen G. Ritteman, Asst. U.S. Attys., Detroit, Mich. (argued) Michael Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., for defendant-appellee.

Before EDWARDS and KEITH, Circuit Judges, and WALINSKI, District Judge.[*]

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge.

Appellant Frank Barney appeals from the decision of the Secretary of Health and

[*] Honorable Nicholas J. Walinski, United States District Court for the Northern District of Ohio, sitting by designation.

Human Services denying his claim that he is disabled within the meaning of the Social Security Act as disability is defined in 42 U.S.C. §§ 416(i) and 423 (1976).

The term "disability" is defined in Section 223 as:

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

(2) For purpose of paragraph (1)(A)— (A) an individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Since our review of this record convinces us that appellant Barney has been and will be disabled within the meaning of the definition just cited, we reverse the judgment of the Secretary and remand to the District Court to remand to the Secretary of Health and Human Services for benefits.

*Allen v. Califano,* 613 F.2d 139 (6th Cir. 1980) summarizes four legal propositions which have been repeatedly endorsed by this Circuit in Social Security disability cases:

1. The burden of proof in a claim for Social Security benefits is upon the claimant to show disability which prevents her from performing any substantial gainful employment for the statutory period. Once, however, a prima facie case that claimant cannot perform her usual work is made, the burden shifts to the Secretary to show that there is work in the national economy which she can perform. *Hephner v. Mathews,* 574 F.2d 359, 361 (6th Cir.1978); *Garrett v. Finch,* 436 F.2d 15, 18 (6th Cir.1970).

2. Convincing proof, consisting of lay testimony supported by clinical studies and medical evidence, that pain occasions a claimant's inability to perform his or her usual work is sufficient to make a prima facie case. *Beavers v. Secretary of Health, Education and Welfare,* 577 F.2d 383 (6th Cir.1978); *Noe v. Weinberger,* 512 F.2d 588 (6th Cir.1975).

3. In determining the question of substantiality of evidence, the reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim. *Whitson v. Finch,* 437 F.2d 728, 732 (6th Cir.1971); *see also Giddings v. Richardson,* 480 F.2d 652 (6th Cir.1973).

4. Substantiality of the evidence must be based upon the record taken as a whole. *Futernick v. Richardson,* 484 F.2d 647 (6th Cir.1973).

613 F.2d at 145.

The government's brief in this case sets forth a reasonably accurate statement of the essentials of appellant's claim:

Frank Barney was born on January 12, 1934, he was 47 years old at the time of the administrative hearing. He has only a ninth grade education, with no additional formal training. He most recently worked as a welder and "joustabout" for the Chipmore Manufacturing Company, supervising as many as fourteen people. Before that he worked for approximately ten years as a pipefitter and brazier for a ship building company. Both of his previous jobs involved frequently lifting up to 100 pound weights, frequent bending and reaching, and very little sitting.

Claimant testified he was fired from his last job on July 25, 1980. He thinks he was fired because he missed too much work because of doctors' appointments and because he was "living on" percodan. However, he mentioned that thirteen other people were fired. He has not tried to work since then. He thinks pulmonary and spinal problems constitute [sic] equally to cause his disability.

Claimant testified that since he stopped working his activities have been very limited. He said he can feed and dress himself "after I am up for a while" and he does some of the cooking for the family. He tries to help with housework, but can vacuum "very little" and gets a backache after two minutes of dishwashing.

Claimant said he had a slight curvature of the spine which became severe only after he had a spine operation in 1979. He claimed he had shrunk five inches in height and lost considerable weight over the past two years.

Examining physicians reported that Barney was 5′9″ tall and that he weighed 135 pounds.

The Secretary concluded on the basis of his work history plus the medical reports to which we will turn shortly, that while appellant Barney was clearly disabled from doing his previous work, that he retained the ability to perform substantial gainful employment of a sedentary variety. In fact, substantial medical evidence in the record reveals a combination of severe A) back and B) respiratory impairments that cause total disability from all employment, including sedentary labor.

### A) Curvature of the Spine

Dr. Hugh Sulfridge with a specialty certificate as an orthopedic surgeon, recounted the origins and development of the claimant's scoliosis in a sworn deposition.

He has a severe left thoracolumbar scoliosis, which is a picture, clinically, of an idiopathic scoliosis, that it came on probably between the age of 11 and 16 years of age. He had worsened to the point that he was—I had the measurements here somewhere, but he's in the category of a severe type curve in the back.

He had fairly well compensated in that he was able to still stand with his hips and shoulders in balance. He points down into the left side, left groin and side where he has a lot of pain and I noted that his rib cage was impinging in the pelvic rim, meaning that he was curved bad enough that his ribs would be down that low on one side, the left side.

\* \* \* \* \* \*

The patient had a severe left lumbar scoliosis, which the etiology of this I'm presuming to be by nature. Idiopathic scoliosis is scoliosis which is developmental and beginning usually about age 10 to 11 and culminating at maturity, around 18, then deteriorating to some degree up into the mid-20's. And somewhere in the—in this period, the third decade of life, the curve becomes fixed and rigid and the patients suffer some degree of attrition over the years. As a result of this attrition, being a compression of the disc spaces, a compression of the pinching of the nerves and things like that and they also have some systemic changes in the heart, lungs, gastrointestinal tract that suffer reflectively from this severe curve.

And in his instance, he's suffered some of these problems and they are ongoing and they are permanent.

\* \* \* \* \* \*

Q All right. And at that time did he give you a history of what was wrong with him?

A Yes, he said that he had back trouble. He was disable from work and that he dated this to changing a motor on a punch press and slipped on the forklift truck with the motor in his arms.

At that time he was treated by Dr. Jones, Dr. Devlin in Midland, and later referred to a Dr. Taheri in Bay City.

There he was placed in traction and given conservative treatment, which

failed, and he underwent a back operation in July of 1979.

Q Okay.

A He had two discs removed. He then returned to work in October of 1979 and November he had a recurrence of pain and was placed on Percodan, which is a strong analgesic, antipain medication. He states he has lived on this medicine since.

Dr. Taheri later saw him and took him off Percodan and put him on Zomax, which is an anti-inflammatory drug, which has some benefits for pain, but mainly it's anti-inflammatory. And the patient states he takes Percodan only now as necessary. He has not worked since July of 1980.

Q All right. And did he tell you when, approximately, he hurt his back originally? You said in 1977 he was operated on, but did he indicate to you when that happened, when he was lifting, I think, a motor, you said, off of the forklift?

A The date of accident I have is March 6th, 1979.

\* \* \* \* \* \*

Q Okay. What would be the effect on the scoliosis of the injury in 1979 that he referred to and that Dr. Taheri operated on him for?

A Well, the stress factors in this back are excessive for normal lifting, then you superimpose on that an extra load or thrust and they become a multiple of stress, rather than just what the situation, lifting or whatever he was doing, weighed. There is a multiple factor there and his back is not structured to accept that stress load, so he would be— he would be worsened.

Q Okay. And, Doctor, is he worsened now as a result of that 1979 incident; is his condition now worse than it would have been otherwise as a result of 1979 incident and the medical that came about as a result of that?

MR. BYRAM: Objection, Counsel, leading and suggestive.

THE WITNESS: Well, everything's in degrees. I think that he was going to have trouble regardless of whether he lifted or not. The fact that he injured his back, was an excessive load for the structure that we are talking about here and it was—I suppose in common parlance it could be described as the straw that broke the camel's back. It was more than his back would take.

I don't have the weight. I was looking for the weight of—it was a motor block or something in this category. I don't have the weight of that, but it would be a multiple factor of that weight; it would not be just that weight. When you're talking about a curve, you're talking about a lever arm with a fulcrum and the effect is that of basically a crowbar or a hoist. And the lever arm in his instance is at a disadvantage in lifting or controlling any weight because of his inherent physiology—not so much physiology—in the spine. So we are talking of—about a multiple factor.

Say if it's a hundred pounds, we are going to multiply that by about two or three or four or five times it of the effect on the spine.

## B) Respiratory Impairment

Two other medical examiners reported on how Barney was disabled by respiratory impairments. Irving J. Kane, M.D. made the following thorough diagnosis for the Michigan Disability Determination Program.

He was employed by the KPS Manufacturing Co. in Bay City for nine years, last working in July of 1980. He always did welding which varied from a few hours a day to all day. He was always exposed to considerable smoke and fumes·which were so dense that at times he could not see the man next to him. There was no exhaust other than the small one which he had installed two years earlier and which "did nothing". The smoke and fumes caused him to cough constantly, at times bringing up bloody sputum and being associated with

chest pain. He had previously done silver brazing on ships where he was surrounded by asbestos insulation work which would fill the air with white dust.

    \*    \*    \*    \*    \*    \*

Pulmonary function studies consisted of forced expiratory spirometry before and after administration of a bronchodilator by low pressure IPPB aerosol. His cooperation was very good. Forced vital capacity was found to be 77% of normal. Forced expiratory volume at the end of one second was 56% of his vital capacity. His maximum mid-expiratory flow rate (FET 25–75% VC) was 34% of normal. Maximum voluntary ventilation (MBC) was 52% of normal. After administration of the bronchodilator there was some improvement in his ventilatory parameters suggesting the presence of an element of reversible bronchospasm.

CONCLUSION: This individual has evidence of chronic obstructive lung disease. This includes a slightly restrictive and markedly obstructive ventilatory abnormality with an element of reversible bronchospasm. He also has evidence of a cardiac valvular abnormality, the nature of which requires further study. He further has evidence of a lumbar scoliosis and of previous surgery involving the lumbosacral spine. This man appears to be disabled with regard to strenuous or sustained physical exertion as well as exposures to dust, smoke, fumes or other air pollutants and extreme temperatures and their range change. He is in need of more adequate medical treatment, but will remain disabled to the degree noted above.

S.H. Mahadevan, M.D. confirmed Dr. Kane's findings:

The pulmonary function test before bronchodilation showed an FEV 1 or 1.4 with a normal predicted of 3.55 and the FVC of 3.6 with a normal predicted of 4.54. After bronchodilation the FEV 1 was 1.5 and the FVC was 3.6. Thus the patient has marked obstructive lung disease that is unresponsive to bronchodilation.

In conclusion, this patient has emphysema. The patient lung exam shows wheezes and rhonchi. The pulmonary function test do show evidence of obstructive lung disease. The patient should be asked to stop smoking completely. He should also be placed on an exercise program to improve his exercise power.

## C) Combined Impairments and Residual Capacity for Sedentary Labor

Dr. Sulfridge is Barney's most recent treating physician and was familiar with both the back and respiratory impairments described above. In his sworn deposition, Dr. Sulfridge assessed the impact of Barney's impairments on his ability to work.

We are not looking at a patient or an individual who can't do anything. In other words he does have arms and legs and he does have muscle controlling these extremities. He's lost control of his spine and that's inherent, and he has absolutely no control of that anymore.

What happens here, though, is a reflex pain phenomenon. So if the pain strikes him in the back or in the low back or in the buttock area, the thighs, the reflex is such that he will momentarily become incapacitated.

Now, this patient has this reflex phenomenon built in all the time. It isn't something that's just going to happen occasionally, so it's there for almost every move of his life, for his daily existence. And though he has outwardly the appearance of capability, knowing what I know about the disorder that I have described in the spine, I don't think he's capable of maintaining any job at the present time and I think this is permanent. I don't think that it is going to change in the future.

Q Okay. Doctor, from your experience in these kinds of cases, and from knowing Frank Barney, would you estimate that the pain that the man would suffer, reflex pain, is such that he could not use his legs in an industrial setting or an industrial capacity?

MR. JENSEN: I'm going to object to the doctor testifying on the industrial capacity unless you can redefine industrial capacity so that the doctor can translate that to his own observations.

Q Well, let's put it this way to make it maybe a little more clear. To work in an industrial setting.

Now, an industrial setting would mean a manufacturing setting that this kind of—that this individual could work in and you know what his work history was somewhat.

A Well, I can only say exactly what I said before, that he would have the reflex pain. He would not be a production-type person. He would suffer an ongoing basis and he does even in sedentary life to a point where, I think, it's prohibitive to expect him to do any kind of work that would require almost any activity; bending, stooping, lifting or even standing on his feet. As a matter of fact, he has trouble sitting for any period of time.

His back is in such disorder that I don't believe he can even rest properly by lying down. I think he's in a constant state of aggravation as far as his back is concerned.

Q Okay. And your prognosis, Doctor, at this point; you suggested it a minute ago?

A It's permanent. The picture that I'm describing is permanent. And this is extremely vague in our prognosis. If an operation could be done on this spine successfully and if the operation itself were successful, if he survived the operation, and if the operation were successful, he would not know probably for a year to what degree it would be successful. We are talking about doing the spine fusion and decompressing the nerves, straightening the spine, the back out as much as is technically feasible. And I don't think we could straighten it out more than 20 or 30 degrees of the curved state, which is going to bring it down even then to a severe back problem.

But the fusion being successful, the pain would be attenuated or eradicated and it would be attenuated to the extent that possibly he could be rehabilitated to some type of work. And we are certainly in a very twilight zone as to try to visualize what we could do with him. I'm not talking about myself, but the medical profession or a specialist in spine surgery.

So I couldn't visualize any thing in the foreseeable future where I can say that this man will be back on any kind of a job, even as a barber or a watchmaker, anything like that. He is in desperate straits, physically.

Our review of this record convinces this court of the following facts. 1) Appellant Barney was afflicted with a serious scoliosis problem from youth. 2) This scoliosis problem was greatly worsened when he slipped and fell on his job while carrying a 100 pound block. 3) Following the accident just referred to, appellant underwent a laminectomy which removed two discs. 4) His exposure to dust in his job function has also given him the further complication of lung disease and asbestosis.

These problems, developmental, accidental and occupational in origin cannot be dealt with individually so as to say that any one of them might alone allow for sedentary work. This applicant like all is a human being whose total anatomy must be taken into account in determining whether or not he is disabled from any substantial gainful employment. In *Allen v. Califano*, 613 F.2d 139 (6th Cir.1980), this court said:

There may well have been a cumulative effect over the course of years produced by Mrs. Allen's physical problems, the many surgical procedures employed to deal with them and the medications prescribed and taken to offset pain occasioned by both the problems and the surgery. The human anatomy is, after all, one organism—even though doctors do not always treat it as such.

613 F.2d at 147.

We hold that the combination of factors shown in this record is such as to require

our reversal of the Secretary's decision and a remand to the District Court for remand to the Secretary for an award of benefits.