908 F.2d 973
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jerry DALTON, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-5774.
 United States Court of Appeals, Sixth Circuit.
 July 16, 1990.
 
 Before KENNEDY and ALAN E. NORRIS, Circuit Judges, and COHN, District Judge.*
 PER CURIAM.
 
 
 1
 Appellant Jerry Boyd Dalton appeals from the judgment of the district court affirming the denial by the Secretary of Health and Human Services of his claim of eligibility for a period of social security disability benefits ("SSD") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. Secs. 416(i), 423 and 1382. For the following reasons, we affirm.
 
 I.
 
 2
 Dalton, a fifty-one-year-old high school graduate and Navy veteran, originally received an award of disability benefits commencing August 7, 1974, based upon an application filed on March 10, 1975. In June 1981, the Secretary reviewed Dalton's condition and, concluding that he was no longer eligible for disability benefits, determined that the last month for which he was entitled to benefits was August 1981. Dalton did not appeal the termination decision. On March 24, 1982, Dalton filed a new claim for disability benefits which was subsequently withdrawn on March 31, 1982, when he thought that he could return to work.
 
 
 3
 Dalton filed a third application for benefits on February 25, 1985, alleging disabilities commencing from February 26, 1982, due to a problem with his vision, left arm, and left foot. This application was denied initially on April 25, 1985, and on his request for reconsideration on August 12. Again, Dalton did not pursue this application but, instead, filed a new application for disability benefits on November 14, 1985. This fourth application, claiming eligibility for benefits commencing August 15, 1974, was again denied through the reconsideration level and Dalton requested a hearing before an Administrative Law Judge.
 
 
 4
 On November 24, 1986, a hearing was held in Chattanooga, Tennessee. The participants included Dalton, his counsel and vocational expert Dr. Benjamin C. Johnston. On January 29, 1987, the A.L.J. issued a decision denying Dalton benefits after concluding that Dalton was not under a disability as defined in the Social Security Act because he retained the residual functional capacity "for at least light to medium work and has not been precluded from engaging in his past relevant work as a paste-up man since at least June 1981." Dalton appealed and, on July 18, 1988, the Appeals Council remanded the case for re-review in accordance with the decision in Samuels et al. v. Heckler, 668 F.Supp. 656 (W.D.Tenn.1986).[1] Upon review, the A.L.J. determined that Dalton was not under a disability subsequent to June 1981 and, on March 31, 1988, denied his application for benefits. The Appeals Council refused Dalton's request for review, and the A.L.J.'s decision became the final decision of the Secretary.
 
 
 5
 Dalton commenced an action for judicial review in the United States District Court for the Eastern District of Tennessee pursuant to 42 U.S.C. Sec. 405(g). After carefully reviewing the entire administrative record, the district court concluded that there was substantial evidence in the record supporting the Secretary's decision that Dalton was not disabled within the meaning of the Social Security Act before March 31, 1982, the last date that he was eligible for Title II benefits, and that he was similarly not disabled for purposes of Title XVI SSI benefits. Dalton subsequently filed a timely appeal in this court.
 
 II.
 
 6
 The evidence upon which the district court based its decision, which consisted of the medical evidence in the record, Dalton's original testimony at the November 24, 1986 hearing, and Dalton's additional testimony at the supplemental hearing on February 26, 1986, included the following:
 
 
 7
 Dalton was born on January 15, 1939, and lives in Cleveland, Tennessee with his mother. Although he is a high school graduate, he admits that he neither reads nor writes well. Between 1965 and 1968, he served in the Navy Seabees. After leaving the Navy, Dalton worked in the shipping and receiving department of a stove company for one year, and in the composing room of a newspaper for two years. He has not held a job since 1974 and has not actively sought employment since 1981. His only source of income is his mother's social security benefits.
 
 
 8
 On August 7, 1974, Dalton fell eighteen feet while at work and fractured his right ankle. An orthopedic examination conducted by Dr. George Shelton in January 1975 revealed an irregular joint surface and, on the basis of the injury and subsequent irregular healing, Dalton was awarded disability benefits. Although the orthopedist recommended that he be re-examined in 1975, Dalton's case was not reviewed by the Administration until 1981, seven years after he fractured his ankle.
 
 
 9
 Between February 13 and 18, 1989, Dalton was hospitalized at the Veterans Administration Hospital in Nashville, Tennessee where he underwent cataract extraction and peripheral iridectomy of his right eye. Dalton was hospitalized at the VA Hospital once again between November 8 and 11 to investigate his complaint of a five-year history of right-sided headaches, and difficulty with visual perception. Although Dalton related a year's history of emotional instability, depression and easily provoked anger, a CT scan revealed no abnormalities and a right temporal headache was diagnosed. Dalton was hospitalized a third time between March 17-26, 1980 when Dr. Patrick Ho performed cataract surgery on his left eye. Sometime in 1980, Dalton also received treatment for a lip lesion.
 
 
 10
 At the request of the Disability Determination Section, Dr. Harry M. Lawrence, a consultant specializing in diseases of the eye, examined Dalton on June 23, 1981, and Dr. W. Houston Price, a consultative orthopedist, examined him on June 23, 1982. In addition, Dalton visited a VA physician on July 13, 1981, at which time he informed the doctor of a blow to his neck which occurred when he was serving in the Navy. Dalton claimed that the blow stunned him and caused him to bleed from his left ear and mouth. An audiogram showed moderate bilateral sensorineural hearing loss for which a hearing aid was prescribed.
 
 
 11
 Dr. Lawrence noted that Dalton's cataract surgery was successful and that, by March 1981, Dalton was wearing bilateral contact lenses all day without discomfort. In addition, Dr. Lawrence noted that he required no medication and that his visual acuity was correctable to 20/20 in his right eye, and 20/25 in his left eye.
 
 
 12
 Dr. Price's examination revealed limitation of motion involving Dalton's ankle, and moderate thickening but no atrophy of his thigh. In addition, X-rays revealed an old fracture of the os calcis extending into the subtalar joint with loss of the tuber-joint angle. Despite his conclusion that Dalton's use of his right lower extremity was extremely restricted, Dr. Price rated him capable of standing/walking for six hours a day.
 
 
 13
 As a result of both examinations, the Social Security Administration determined that Dalton had sustained significant medical improvement and that his disability had ceased as of June 1981 because he regained the capacity to resume his former work as a paste-up man, an occupation classified as light work. Although he did not appeal the decision terminating his benefits, Dalton claims that he was unable to find work, as no employer would hire him because of his medical history.
 
 
 14
 Dalton underwent yet another round of surgery in March and May 1982 and February 1983. Dr. Edward B. Feinberg, a retina specialist, diagnosed retinal detachments and performed the requisite corrective surgery. Dalton was released and, although his eye surgery went well, was treated again in September 1982 for chronic externa otitis involving his left ear. At a follow-up examination a year later, Dalton seemed to be "doing well."
 
 
 15
 In March 1985, Dalton was once again examined at the request of the Social Security Administration. The examination was unremarkable except for a finding of minor obesity and scarring consistent with Dalton's dermatitis. The otitis externa was found to be "zero percent disabling." He was once again instructed in the proper use of his hearing aid.
 
 
 16
 On June 3, 1985, Dalton was treated at a VA Hospital for lacerations on his hand. Evidently, he became dizzy and fell against a mirror. Subsequent tests showed moderate to severe hearing loss, but the exact cause of his vertigo is disputed among his physicians.
 
 
 17
 Another unremarkable examination was conducted in January 1986, again at the request of the Administration. Dalton appeared muscular and admitted that he had been working with Nautilus machines at a local fitness center. His conversational hearing appeared normal despite the lack of a hearing aid, and he also appeared devoid of discomfort.
 
 
 18
 Dalton underwent a psychological evaluation in January 1986. Brenda Simons, M.S., who was supervised by Tom A. Biller, Ed.D., administered a series of tests (Wechsler Adult Intelligence Scale-Revised, Bender Visual Motor Gestalt Test, Wide Range Achievement Reading Test, Mental Status Evaluation, Rorschach Inkblot Test and the Clinical Interview) and concluded that he was of average intelligence and had a passive-dependent personality disorder. She noted that Dalton's thought process was logical and rational and his conversation coherent, and he behaved appropriately and cooperated with the examiner.
 
 
 19
 At the request of Dalton's attorney, another psychological evaluation was conducted by Dr. David Goldsmith, a clinical psychologist, on September 23, 1986. The results of his test were similar to those conducted by Ms. Simons. However, in addition to recognizing that Dalton was experiencing a significant depression and had passive-dependent personality disorder, Dr. Goldsmith concluded that "with his education level, medical history, employment record, and psychological status, ... he would be very unlikely to succeed at gainful employment." Dr. Goldsmith also concluded that Dalton would not be a suitable candidate for vocational rehabilitation.
 
 
 20
 At his first hearing, Dalton testified that he has never married and lives with his mother. He was temporarily employed as a construction worker in 1981, but has not worked since then because he has been advised that he is an insurance risk. He also testified that he suffers from numerous ailments including headaches, dizziness, visual disturbances, low back pain, and pain associated with varicose veins.
 
 
 21
 The A.L.J. noted that despite his subjective complaints of pain, Dalton remains active and can lift up to eighty pounds. He continues to perform household chores including grocery shopping. He sometimes walks one and one-half miles to a local fitness center where he uses a whirlpool for his leg and rides a stationary bicycle.
 
 
 22
 The A.L.J. recognized that if Dalton's testimony was accepted as fully credible, he would not be able to perform substantial gainful activity. However, given his testimony regarding his daily activities, the A.L.J. did not find Dalton fully credible.
 
 
 23
 Dr. Benjamin Johnston, the vocational expert who is also a licensed psychological examiner, classified Dalton's past work as light semi-skilled. In a hypothetical posed to Johnston, the A.L.J. asked him to assume the ability to perform unskilled work or employment that does not require extremely fine finger dexterity with an IQ level approximating that contained in the two sets of psychological evaluations. In response to the A.L.J.'s query, Johnston replied that there are a significant number of jobs available that such a hypothetical person could perform, both in the Cleveland-Chattanooga region and in the national economy, such as wrapping small objects for shipment or to code them, finishing work, etc. However, the vocational expert admitted, in response to a question posed by the A.L.J., that if Dalton's testimony is accepted as credible in all respects, there are no jobs existing in significant numbers that he could perform. Similarly, in a question posed by Dalton's attorney, the vocational expert stated that assuming the reports of Drs. Goldsmith and Biller to be accurate, there would be no jobs that exist in significant numbers that Dalton could perform.
 
 
 24
 After reviewing the testimony and medical evidence, the A.L.J. rendered his decision on January 29, 1987. He concluded that the evidence was insufficient to establish that Dalton was incapable of performing substantial gainful activity due to psychological disorders. In addition, although the A.L.J. recognized that subjective complaints of pain are difficult to measure and evaluate, he was inclined to disbelieve Dalton's claims. Dalton has not been using any prescribed pain medication on a regular basis. Similarly, the A.L.J. concluded that given Dalton's activities during the claimed period, it would be unreasonable to conclude that Dalton had experienced debilitating symptomatology. Therefore, the A.L.J. concluded that Dalton was capable of performing both his past relevant work and other types of light and semi-skilled work and, accordingly, was not under a disability as defined in the Social Security Act. Despite the new medical evidence introduced at the second hearing, the second A.L.J. concluded that there was no basis for modifying the original decision.
 
 
 25
 Dalton claims that the Secretary's finding that he had the residual capacity to perform a wide range of light and semi-skilled work is not supported by substantial evidence. Specifically, he claims that the Secretary failed to consider his impairments in combination. In addition, Dalton claims that the Secretary failed to satisfy the burden of establishing the existence of a substantial number of jobs in the national economy which Dalton is capable of performing.
 
 III.
 
 26
 The final decision of the Secretary is subject to judicial review pursuant to 42 U.S.C. Sec. 405(g), which specifies that the Secretary's factual findings are conclusive if supported by substantial evidence. This court has recognized that substantial evidence is more than a scintilla and is, in essence, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Secretary of Health & Human Serv., 667 F.2d 524, 535 (6th Cir.1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)), cert. denied, 461 U.S. 957 (1983). To determine whether the Secretary's factual findings are supported by substantial evidence, this court must examine the evidence in the record "taken as a whole." Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980), and "must take into account whatever in the record fairly detracts from its weight." Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir.1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). However, this court may not reweigh the evidence or substitute its own judgment for that of the Secretary, even if it concludes that a preponderance of the evidence goes against the Secretary's decision. The fact that the record may also contain substantial evidence in support of a different conclusion than that of the Secretary is irrelevant. Crisp v. Secretary of Health and Human Serv., 790 F.2d 450, 453 n. 4 (6th Cir.1986). In short, if the decision is supported by substantial evidence, the Secretary's conclusion must stand. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir.1983).
 
 
 27
 The claimant has the ultimate burden of establishing his entitlement to benefits by proving the existence of a disability as defined in 42 U.S.C. Sec. 423(d)(1)(A). If the claimant is working, and this work constitutes substantial gainful activity, benefits are denied automatically. 20 C.F.R. Secs. 404.1520(b), 416.920(b). Similarly, if the claimant does not have an impairment which significantly limits his ability to work (a severe impairment), then the claimant is not disabled. 20 C.F.R. Secs. 404.1520(c), 416.920(c). In the instant matter, the A.L.J. determined that Dalton had not engaged in substantial gainful activity since the alleged onset date but that he does not suffer from a severe impairment.
 
 
 28
 The next step in the disability analysis is to determine whether the claimant suffers from one of the impairments listed in Appendix 1 of Subpart P of Regulations No. 4 ("listings"). If so, and if claimant has met the listing's durational requirement, a finding of disability will be made without consideration of vocational factors. 20 C.F.R. Secs. 404.1520(d), 416.920(d). The A.L.J. in the instant matter found that, while Dalton's medical history included a fractured right os calcis, visual impairment, hearing loss, chronic externa otitis, chronic lower lip lesions, and passive-dependent personality with slight depression, he does not have an impairment or combination of impairments equal to any specified in the listings. In addition, the A.L.J. concluded that Dalton's subjective complaints of chronic pain were not credible and, therefore, that he retained the capacity to resume his past work as a paste-up man. Pursuant to 20 C.F.R. Secs. 404.1520(e) and 416.920(e), the A.L.J. concluded that Dalton was not disabled.
 
 
 29
 Although the A.L.J. could have ended his analysis at this stage, he nonetheless discussed Dalton's ability to perform a wide range of occupations, in addition to his past work, that are available both regionally and nationally. However, since Dalton did not establish a prima facie case of disability by showing "a medical basis for an impairment that prevents him from engaging in his particular occupation," Hephner v. Mathews, 574 F.2d 359, 361 (6th Cir.1978), the burden of establishing Dalton's ability to work did not shift to the Secretary.
 
 
 30
 Dalton first argues that the A.L.J. failed to acknowledge the shifting burden of proof and failed to consider evidence which contradicted his conclusion regarding the availability of jobs which Dalton is capable of performing. In the first place, the Secretary was not required to sustain the burden of establishing Dalton's ability to work because the A.L.J. had already concluded that he was capable of engaging in his past relevant work as a paste-up man. Second, contrary to Dalton's assertions, the A.L.J. did recognize that there was conflicting vocational and psychological testimony. The A.L.J., however, chose to discount the vocational expert's conclusions regarding Dalton's psychological condition because, "while [the vocational expert] is a psychologist, [his] opinion is based upon psychological factors to a significant degree and is, therefore, outside the purpose for which he was called as a vocational expert." Instead, the A.L.J. considered the psychological evidence independently, including Dr. Goldsmith's evaluation, and concluded that the evidence was insufficient to establish Dalton's inability to perform substantial gainful activity, either his past work or unskilled work, due to mental causes. Substantive evidence, therefore, supports this determination.
 
 
 31
 The A.L.J. recognized that adequate consideration of a mental impairment ideally requires consideration of a treatment record of at least several visits. Here, the A.L.J. only had two consultative reports at his disposal, one of which was prepared upon the advice of Dalton's counsel. While both reports suggested that Dalton suffers from passive-dependent personality disorder, neither of the reports suggests how this disorder prevents him from performing his past work or other types of work. Indeed, the evaluations suggest that Dalton's mental impairments do not impair his ability to work. Neither evaluation establishes that he is unable to relate to co-workers or supervisors sufficiently to perform his past work. Similarly, neither evaluation suggests the lack of ability to follow instructions. Both evaluations recognize that despite Dalton's psychological state, there is no restriction of activities of daily living or difficulties in maintaining social functioning. During the recent past, Dalton's routine activities included performing household chores, yard work, driving, working with leather as a hobby, and hiking. The evaluations did not indicate sufficient deficiencies of concentration, persistence or pace, and did not establish any episodes of deterioration or decompensation in work or work-like settings. Therefore, we reject Dalton's contention that the A.L.J.'s decision is contrary to the psychological evaluations.
 
 
 32
 Dalton also contends that the A.L.J. failed to consider his impairments in combination. This court has previously recognized that health problems cannot be dealt with individually so as to say that any one might enable a person to engage in sedentary work. Instead, an applicant for social security benefits must be seen as "a human being whose total anatomy must be taken into account in determining whether or not he is disabled from any substantial gainful employment." Barney v. Secretary of Health and Human Serv., 743 F.2d 448, 453 (6th Cir.1984). Upon a careful review of the A.L.J.'s decision, we cannot say that Dalton's impairments were not considered in combination. Indeed, the A.L.J. specifically stated that, "[w]hile the claimant's impairments, in combination, may be severe, they do not prevent the performance of [Dalton's] past relevant work as a paste-up man."
 
 
 33
 Significantly, the A.L.J. considered Dalton's entire physical and psychological state, including his injuries, skin ailments, surgeries and hearing impairments, but concluded, nonetheless, that "there has been no significant restriction of activities of daily living or difficulties in maintaining social functioning." Again, Dalton testified that he performed a wide variety of household tasks, was fit enough to walk one and one-half miles to work out at a local fitness center and, although unsuccessful, sought employment. The A.L.J. also recognized that there was insufficient evidence to establish deficiencies of concentration or decompensation in work-like settings. This court has recognized that the performance of daily activities may be used to undermine a claimant's allegations of disability. Gist v. Secretary of Health and Human Services, 736 F.2d 352, 357-58 (6th Cir.1984). We conclude that the A.L.J. considered Dalton's impairments in combination and that substantial evidence supports the conclusion that he is able to perform not only his previous work but also a wide variety of light and semi-skilled occupations.
 
 
 34
 Finally, we note that Dalton's complaints of disabling pain were properly rejected by the A.L.J. because the medical evidence failed to confirm the severity of the pain. Although Dalton alleged fully disabling and debilitating symptomatology resulting from his leg injury, head injury, surgeries, hearing problems and varicose veins, an A.L.J. may dismiss a claimant's subjective allegations of pain as implausible if the A.L.J.'s personal observations and objective medical evidence contradict the allegations. Here, the A.L.J. recognized that none of the medical examiners, including the treating physicians, concluded that Dalton was totally disabled. In addition, while Dalton complained of various sources of pain, he never used pain medication on a regular basis. As the A.L.J. properly recognized, "[t]he claimant's activities as noted throughout the record would clearly be consistent of [sic] an individual with the alleged symptoms."
 
 IV.
 
 35
 For these reasons, we conclude that there is substantial evidence supporting the Secretary's decision that Dalton is not disabled and that he retains the ability to perform both his previous work and a range of additional occupations which are available in the national economy. Similarly, the A.L.J. considered Dalton's ailments in combination but nevertheless concluded that his subjective allegations of severe disabling pain are not supported by the objective evidence in the record as a whole. This conclusion is also supported by substantial evidence.
 
 
 36
 Accordingly, the decision of the district court is affirmed.
 
 
 37
 COHN, District Judge, dissenting.
 
 
 38
 I respectfully dissent from the majority opinion because I take a different view of Dalton's intellectual capabilities and psychological impairment. This requires some extended explanation.
 
 
 39
 The majority states that Brenda Simons, M.S., conducted a psychological evaluation of Dalton and concluded that he "was of average intelligence." This appears to be a misreading of the statement in the evaluation that Dalton scored "within the low average range of intellectual ability" on the Wechsler Adult Intelligence Scale-Revised test. The test results discussed in the evaluation clearly show that Dalton's intelligence is significantly below average. According to Simons's evaluation, Dalton scored within the average range in only two of the Wechsler test's eleven categories. When the Wechsler test was conducted by Dr. David Goldsmith, he obtained similar results, again placing Dalton within the "low average range of intelligence." Notably, Dr. Goldsmith went on to explain that Dalton's performance was "exceeded by 84% of agemates in the general population."
 
 
 40
 Also, the majority too readily accepts the A.L.J.'s rejection of the vocational expert's testimony regarding Dalton's ability to work. The majority notes that "in response to a question posed by the A.L.J.," the vocational expert admitted that "if Dalton's testimony is accepted as credible in all respects, there are no jobs existing in significant numbers that he could perform." It then lumps this stock response to a standard question together with the much more important question, raised by Dalton's attorney, of whether Dalton can perform any jobs existing in significant numbers if he suffers from a passive-dependent personality disorder. In response, the vocational expert testified that a passive-dependent personality disorder of the severity noted in the evaluations of Simons and Dr. Goldsmith would prevent Dalton from doing so. By treating the vocational expert's view of the uncontroverted psychological evaluations as similar to his view of Dalton's equivocal testimony, the majority robs crucial testimony of much of its significance.
 
 
 41
 Having done so, the majority may then more easily reject the vocational expert's testimony on the ground that it was "based upon psychological factors to a significant degree" and therefore was "outside the purpose for which [the vocational expert] was called." This rationale is suspect for two reasons. First, the vocational expert was an experienced, licensed psychologist. Therefore, he was perfectly competent to testify as to the effect of Dalton's passive-dependent personality disorder on his ability to work. The only way that such testimony can be outside the purpose for which he was called is if the Secretary can call him for the sole purpose of denying Dalton benefits. The determination that substantial evidence supports the Secretary's findings must be based on the record as a whole. Landsaw v. Secretary of HHS, 803 F.2d 211, 213 (6th Cir.1986). The Secretary and the A.L.J. cannot put words back into the vocational expert's mouth simply because they do not want to hear them. Second, the vocational expert based his testimony on the assessments of the vocational effects of Dalton's passive-dependent personality disorder contained in the psychological evaluations in the record. He made no diagnosis or evaluation of his own. Like the majority, he assumed that Dr. Goldsmith's evaluation was credible; however, that assumption led him to the opposite conclusion as to Dalton's ability to work.
 
 
 42
 Based on its rejection of the vocational expert's testimony, the majority finds that Dalton did not make out a prima facie case of disability to be rebutted by the Secretary. In doing so, the majority refers to conflicting vocational and psychological testimony. There is no such conflict in the record. Dr. Goldsmith stated explicitly that Dalton was "very unlikely to succeed at any gainful employment." Simons concluded only that Dalton was "capable of managing his own funds, if awarded"--hardly a ringing endorsement of Dalton's ability to work. Finally, the vocational expert testified that if Dalton suffered from a passive-dependent personality disorder as described in the psychological evaluations, he could not work.
 
 
 43
 The majority creates conflict by relying on what is not contained in the psychological evaluations, rather than the explicit statements made in them, as support for the Secretary's decision. Because neither evaluation states that Dalton is unable to relate to co-workers or supervisors, follow instructions, concentrate, or perform daily living activities, the majority concludes that he is able to perform his past relevant work. This strains both the boundaries of the record and the definition of substantial evidence. When the evaluations say that Dalton has a passive-dependent personality disorder and nothing in the majority opinion calls these determinations into question or suggests that they were not based on objective data, they cannot be ignored. At a minimum, the psychological evaluations establish that Dalton cannot perform his past relevant work. This places the burden on the Secretary of proving that Dalton can perform other work. Because the Secretary has not met this burden, Dalton is entitled to benefits.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Samuels et al. v. Heckler was a class action affecting all disability claims in Tennessee in which the court required that specific criteria and procedures be followed in evaluating disability claims