Everett V. NOE, Plaintiff-Appellant,

v.

Caspar WEINBERGER, Secretary of Health, Education & Welfare, Defendant-Appellee.

No. 74–1813.

United States Court of Appeals, Sixth Circuit.

March ·18, 1975.

William A. Watson, Watson & Watson, Middlesboro, Ky., for plaintiff-appellant.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., Robert M. Murphy, R. Burl McCoy, Asst. U. S. Attys., for defendant-appellee.

Before EDWARDS, McCREE and MILLER, Circuit Judges.

EDWARDS, Circuit Judge.

Appellant Everett V. Noe appeals from the judgment of the United States District Court for the Eastern District of Kentucky which granted summary judgment to the Secretary of Health, Education and Welfare concerning appellant's claim to disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–431 (1970), as amended, (Supp. II, 1972). Our review of the evidentiary record made before the Administrative Law Judge and the Appeals Council of the agency discloses substantial evidence to support the total disability claim of appellant. It discloses no substantial evidence to support the Secretary's conclusion that plaintiff has residual capabilities for "substantial gainful activity." We reverse the District Court and remand for award of benefits.

## THE APPELLANT'S CASE

Appellant Noe is a 52-year-old ex-coal miner from Harlan County, Kentucky. He had five or six years of schooling in Harlan County; he worked for 16 years at labor jobs in deep mines and for approximately the same period at machine production jobs in various industries in Illinois, Ohio and Kentucky.

1. It seems particularly inappropriate for this administrative agency's Hearing Examiner to be termed a "judge" when the agency supplies no legal representative other than him, and when the Examiner feels required (as he obviously did here) first to develop the government's case and then to judge it. This

At the Social Security Administration hearing (under cross-examination of the Administrative Law Judge[1] who served effectively as the Department's counsel in this case), Noe testified concerning his work in the mines:

A   Well, I worked in the mines until, it was about sixteen years there. I worked in the mines, after I come out of the Army and went to work in the mines as soon as I got out of the Army and I believe up in the—I wouldn't say what year in the '50s but it was in the '50s when I quit the mines.

Q   What did you do in the mines, Mr. Noe?

A   I was what they call a coupler.

Q   Coupled cars?

A   Yeah.

Q   Did you do any other type of work while you worked in the coal mines?

A   Yeah, I loaded cars.

Q   Loaded, handloaded?

A   Yeah.

Q   Did you do any other work, any blasting in the mines?

A   No.

Q   Did you help anybody on the machine, cutting machine?

A   I have, what you call this shoveling after the machine, I never did operate it.

Q   You never were an engineman or anything like that?

A   No, sir.

Q   You didn't do any maintenance or repair?

A   No.

Noe testified concerning two jobs he held where he operated presses. Then still under cross-examination by the Ad-

record discloses that the Administrative Law Judge wrote 33 pages of a 44-page hearing transcript (including the first 23 pages of the record where he cross-examined appellant extensively) as compared to five pages (including both direct and cross-examination) by appellant's counsel and six pages of colloquy.

**590**

ministrative Law Judge, he described his reasons for quitting his last place of employment in July of 1971:

Q * * * [Y]ou relate you became unable to work on July 5, 1971, and where you were then working at this place in Covington, Kentucky, then?

A Yeah.

Q Why did you quit work in July of '71?

A Well, my back and my hips got to hurting me so bad I just couldn't hardly bear it. Had some lifting to do I get so I couldn't hardly walk.

Noe then described his physical condition at the time of hearing:

Q What functions does your condition prevent you from performing, can you walk?

A Yes, I can walk.

Q Can you stoop down?

A Naw, I can't bend none, I can bend just a little bit and if I bend over any length of time I can't hardly straighten up, it's all I can do to straighten up.

Q How about to squat?

A I can squat down so far and then if I squat all the way down it throws pressure on my hip.

Q How about reaching with your arm does that produce any trouble for you?

A No.

Q How long have you been walking by using a cane?

A About—I believe about six months. It seems to take some weight off of my hip.

Q How long can you stand?

A Well, I can stand quite a while, say forty-five minutes or an hour but sitting down, it really gets me when I'm sitting down.

Q You mean all the time or just after having stood?

A All the time.

Q Whenever you attempt to sit you have—it produces pain?

A I can lay down okay but sitting, driving a car or anything like that just—just murders my back and hip too.

The Administrative Law Judge then questioned him about other sources of income or aid:

Q You mentioned earlier that you were drawing a veterans pension, can you tell me how much that is?

A $130.

Q That's non-service connected?

A Yes, sir.

Q Are you getting any food stamps or any medical card or anything like that?

A No, I don't.

Q No welfare?

A No, never been on welfare, no.

Q And I assume from your description of your disability that it was not connected with the work which you were doing in Covington at the time when you were working there and quit and that you possibly were not eligible for workmen's compensation?

A No, sir, I didn't feel like that I got my back hurt there.

Q And you didn't apply for it?

A No, sir.

Q Did you apply for unemployment compensation?

A Not after you quit on them, no sir.

Q Did you have any insurance of your own, any health benefit insurance of any kind when you quit work?

A I had Blue Cross and Blue Shield.

Q Do you continue to carry that?

A I did as long as I could afford it and then after so long a time I dropped it.

Q Had to drop it and you don't now have it, I take it?

A No, sir.

From a medical point of view Noe's testimony was supported by clinical findings in a Veterans Administration medical evaluation which resulted in his be-

ing awarded non-service connected disability benefits of $130 a month.

It was also supported by the X-ray findings and diagnosis of Dr. Simmons:

IMPRESSION: 1. Rather severe degenerative disc changes at L–2, 3 and L–4, 5 and perhaps L–5 S–1.

2. More significant is the marginal changes of the vertebrae at L–2 3, particularly in the anterior two thirds about the left side which I believe are productive changes as the result of chronic trauma from degenerative disc disease rather than due to infection or tuberculosis but these two possibilities certainly do exist and since we have no previous lumbosacral spine films I would recommend we get a follow up film in a month and see if there is any significant change but I doubt it.

It was also supported by the history, clinical findings and diagnoses of Noe's physician, Dr. Robert Smith Howard:

I  *History*: (Give complaints, past and present, clinical course, including therapy and response.)

1.  Pain over lumbar back radiating down rt. and left legs.

2.  Numbness rt. and left legs.

3.  Soreness across lumbar back.

Onset one year before admission to the hospital for treatment 11–22–72. He noticed that when he lifted anything his back caused him severe pain. The only relief he noticed was lying down. This pain has progressively grown worse with numbness radiating down his right and left legs. At the present time he has pain even while in the bed. He is unable to bend his back and the slightest effort activates the pain and soreness.

Patient separated, 2 children. Miner 11–12 years, Machine operator.

II  *Physical Findings*: Please show all pertinent findings (with dates).

Height 68″ Weight 164 T. 97.8 P. 70 R. 18 B.P. 164/98

The patient is a fairly well developed and nourished 50-year-old man not apparently ill. Eyes, glasses, ears, nose, mouth normal. Neck and chest symmetrical muscular. Lungs filled with fine rales. Heart slow and regular. Abd. muscular. G1 [?] normal. Marked soreness lumbar back with limitation of motion. No notable atrophy lower extremities and some loss muscular control.

III  *Laboratory and Special Studies:* -0-

IV  *Diagnoses*:

1.  Lumbar disc syndrome bilateral.

2.  Hypertrophic arthritis spine severe.

What we have just quoted from this record represents substantial lay and medical testimony which required the finding (which was made by the Administrative Law Judge) that appellant was completely and totally disabled from his previous occupations of miner and production worker. We also believe that these proofs served to establish a prima facie case that appellant was completely and totally disabled from any substantial gainful employment for in excess of a period of one year.

### THE GOVERNMENT'S CASE

The Administrative Law Judge in denying appellant's disability claim relied upon two evidentiary items. The first was a medical report from an orthopedic surgeon, Dr. Patterson, to whom the Administrative Law Judge had sent Noe for examination. The second was the answer to a hypothetical question put by the Administrative Law Judge to a vocational expert witness, Dr. Auvenshire, who was called as a witness by the Administrative Law Judge.

Dr. Patterson's report in pertinent part follows:

On October 20, 1971 Mr. Everett Noe was examined and x-rayed in my office. The patient states that he was in the army from 1942–1945. He denies any injuries while in the service, but he said that he did do a lot of heavy lifting in the army and had trouble with his low back when he came out of the service. After the

army, he worked in the coal mine for 8 years loading coal. He was never injured in the mines. He then worked in Detroit in a factory as a machine operator polishing the insides of brake drums for 4 or 5 years. He then worked in Illinois in a plastic molding machine (electrical materials) for 6 years. Then he worked for the Monarch Tool Company in Covington, Kentucky doing assembly work on coin shoots for laundry-mats for 4 years and stopped 3 months ago because of low back pain which was going into both hips and legs and especially the right leg to the ankle.

He has never had any particular injury to his low back or legs; but through the years his low back and legs have gotten worse. Actually the leg pain began about a year or so ago. He has never been operated on for his back nor has he been hospitalized for his back. His back was x-rayed at Harlan Hospital around July 16 as an outpatient as a patient of Dr. Smith Howard. Dr. James Foley at Loyal, Kentucky x-rayed his back about a month ago. Both doctors have given him pain pills but he has never had any physical therapy. He is not taking any pain medication now. He says he does not like to take it. He says that both doctors told him he has arthritis and 2 cracked discs in his low back. He wore a lumbosacral corset for his low back in April of this year. He bought it at a drug store but he said it did not seem to help. He wore it for 2 months. He has never been seen by a neurosurgeon or an orthopedic surgeon before.

*    *    *    *    *    *

X-rays were made in my office today and included a routine lumbar series as well as a 45-degree oblique view of the lumbar spine and a standing AP of the pelvis with the patient standing barefooted and with his knees and hips in extension and with his ankles together.

X-rays of the lumbar spine showed marked degeneration of the disc between the second and third lumbar vertebra and to a lesser extent between the third and fourth; and considerable narrowing of the disc between L-4 and 5 and the lumbo-sacral disc. He also has a moderately severe right lumbar roto-scoliosis marked with arthritic spurs at the center or apex of the scoliotic curve in the mid lumbar area. The opposing margins were the vertebra bodies.

The standing AP of the pelvis revealed only a ⁵⁄₁₆″ pelvic tilt, so it would appear to be a shortening of one extremity actually representing a pelvic obliquity due to the roto-scoliosis of his lumbar spine. There was no evidence of any old or recent fractures of the lumbar spine nor congenital anomalies. This would appear to be a developmental roto-scoliosis which has existed for years probably back when he was an adolescent and at that time representing an idiopathic scoliosis. There was no history of polio.

With the work in the coal mines, etc. and the type of work he has done over the period of years has produced this arthritic condition of his back. It is somewhat amazing that his back is as mobile as it is with the x-ray appearance of his lumbar spine. I can see why he would have pain in his back on flexing or twisting motion of his back. On x-ray the appearance of his back is that of a coal miner who has worked in a coal mine for 20 to 25 years.

It is possible that this man could do very light work which would require a minimal amount of bending and lifting and not working in one position for a long period of time; but as far as any manual work I think from a functional standpoint he is impaired as far as his low back is concerned.

The two hypothetical questions asked by the Administrative Law Judge follow:

Q  I would like to give you two or three assumptions now, if I may, and the first of which would be that I would like you to assume that the claimant has the condition about which

he has testified and to the degree that he has testified about it, and to assume that the medical evidence substantiates that when you consider his age, his education, his past work experience, would you think that he would have the residual capacities and the transferability of skills under that hypothesis to engage in substantial gainful activity?

A No, sir, not if the condition is as severe as testified to and substantiated medically, and the pain is as severe as he has indicated I would say that he essentially would be unable to work at any job.

Q If the hearing examiner were to find—another assumption—that the claimant did have some degeneration of his spine, particularly in the discs in the lumbar vertebrae, and that it was the source of pain yet he had good movement, a minimal amount of restriction of movement, that he could move his legs, his arms, his shoulders, with no restriction in the upper part of his body, and the pain seemed to be confined to the lower portion of his back and his legs, yet it was not of such an extent that he didn't have pretty good movement on bending by the doctor of his legs, and that the doctor in his report indicated that he thought that the man could engage in some type of activity which would require a minimal amount of bending and lifting, one that would not require him to remain in one position for a long period, indicating that he might be able to stand or sit alternately at his own option according to his feelings, would you then consider his age, his education, his past work experience, and say whether or not you think that he could engage in substantial gainful activity?

A Yes, under this set of conditions I believe he could. I say this because I don't see any reason to rule out employment, and I believe there are people working at jobs of this nature with disabilities which are roughly comparable.

MR. WATSON: Let me object, just for the record there, at that point, to the question which is a hypothetical anticipating facts and not based on facts in the record, and the response which apparently relies upon case histories of other claimants as the basis for the answer. This is not pertinent to this case.

Q All right, let the objection be overruled.

On the basis of his answer to the second set of assumptions, Dr. Auvenshire testified to the existence of light jobs in the national economy:

A Yes, if we consider jobs which offer the possibility of sitting or standing alternately, limiting the category to sedentary type jobs, and there are a few of these—there are a few categories of jobs—there are several jobs within the category. I am thinking specifically of the job of assembler at the Elicon Corbin Company in Corbin, and there are some 75 jobs of assembler of small parts which is essentially bench-type assembly, using small hand tools, pliers, screwdrivers, and so on. There is a job of bench assembler at the American Technical Machine Corporation in Lexington, as an example, again there are some 62 of these jobs having to do with the assembling of parts of Christmas trees and Christmas decorations. There is the job of foreman at the Brown & Williamson Tobacco Company, which is a sitting down job also. There's some 35 to 6 of these. This again is in Lexington. With regard to jobs which would involve standing part of the time, with some degree of movement, some bending, some twisting of the trunk and so on, classified as light jobs, meaning frequent lifting or handling of objects or packages weighing up to 10 pounds or so but rarely anything up to 20, there's a job of machine packager at the Dixie Cup Company, which is a machine tending job. There's some 10 or 12 of these in Lexington. The job of hand packager at the same company, there's some 15 of these. There's

the job of forming machine operator, which is a machine tending job, about 24 of these. Then again at the American Technical Machine Corporation there's a job of grinder, which is the deburring or the sanding off of machine sander of casings for IBM typewriters, there's some 25 of these. There's a job of production assembler at the same company which is a light job of putting together the components of the typewriter; materials handler, there's some 50 of these jobs, classified as light. There's a job, and this time at Brown and Williamson conveyor-feeder, some 200 of these jos, which is essentially watching a large conveyor that moves tobacco around the floor, the stemming and the drying operation. At the Vogue Rattan furniture company, again in Lexington, there's some 14 jobs as hand sander, or finishing off the wood furniture, which is light, as rattan furniture is. And these are a few examples of the kinds of things which fall within the limitations as specified in the assumption. This is not an exhaustive list, but I think these are about—among the most representative things which are appropriate to the set of limitations as given.

CLAIMANT: Pardon me, are there any of them jobs that you can lay down on when the pain got to hurting you so bad that you couldn't stand or sit?

MR. WATSON: I'm going to ask him that now you just (laughter) be still. We'll come to that in a minute.

\* \* \* \* \* \*

MR. WATSON: Let me ask one more question of Mr. Noe here, for the basis for some cross-examination here. Mr. Noe, how long can you stand before your back commences to hurt?

CLAIMANT: Not very long, I'd say half hour or 45 minutes and I've got to sit down or lay down, lay down is better than anything.

MR. WATSON: Is this standing in one place [or] is this walking around?

CLAIMANT: It doesn't make any difference.

The Administrative Law Judge denied benefits to appellant on the following reasoning which the Appeals Council and the District Court accepted without critical analysis:

Claimant alleges that he became unable to work on July 5, 1971, because of back and spine trouble. The medically acceptable clinical and diagnostic evidence of record fails to sustain a symptomatology of the severity described by the claimant.

Lumbar spine x-rays have consistently been interpreted as showing degenerative disc changes diagnosed as hypertrophic arthritis, severe. Physical examinations have otherwise been essentially normal except for hypertension which has not resulted in any end organ pathology.

Clinical findings on orthopedic examinations of the claimant have been essentially similar. He walked with a normal gait; could squat and arise without assistance from his hands; ankle and knee jerk reflexes were equal and physiological and he had essentially normal sensation and muscle strength in both lower extremities. Circumference measurements of the lower extremities showed no clinical evidence of atrophy, however, the leg length measurements showed the right leg was ¼″ shorter than the left and could be alleviated with a ¼″ block under the right foot. There was no restriction of hyperextension or rotation to the right or left and no muscle spasm although he was subjectively tender over the lumbosacral joint. Straight leg raising was performed bilaterally to 90 degrees with only mild discomfort in the low back. There was no significant neurological deficit (Exhibits 15, 17 and 22).

Functionally, claimant was described as limited to very light work requiring a minimal amount of bending and lifting and permitting frequent changes in position.

It is the opinion of the undersigned that this evaluation of claimant's functional capacity is consistent with the medical evidence of record, and considering that, and claimant's age, education and vocational background, he retains the functional capacity to engage in a substantial variety of sedentary and light entry-type jobs enumerated by the vocational expert and that such jobs exist in significant numbers throughout the national economy.

Accordingly, the claimant has failed to make a showing of substantial disability within the meaning of the Act and therefore there is not a sufficient showing of inability to engage in substantial gainful activity. On the basis of these considerations, the following findings are made.

The Administrative Law Judge and the District Judge both erred in applying the law to the facts of this case.

The applicable statutory provisions are contained in § 223(d) of the Social Security Act, as amended (42 U.S.C. § 423(d) (1970)):

(d)(1) The term "disability" means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; or

\* \* \* \* \* \*

(2) For purposes of paragraph (1)(A)—

(A) an individual (except a widow, surviving divorced wife, or widower for purposes of section 402(e) or (f) of this title) shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists

in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

\* \* \* \* \* \*

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

\* \* \* \* \* \*

(5) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.

42 U.S.C. § 423(d)(1)(A), (2)(A), (3), (5) (1970).

■ Clearly plaintiff presented a prima facie case of total and permanent disability with respect to his normal work. In such a situation the burden shifts to the government to go forward with proof that claimant nonetheless has residual capabilities for "substantial gainful activity." Gray v. Finch, 427 F.2d 336 (6th Cir. 1970); Miracle v. Celebrezze, 351 F.2d 361 (6th Cir. 1965). See also Whitson v. Finch, 437 F.2d 728, 732 (6th Cir. 1971).

■ This circuit (and others) has repeatedly held that pain alone can be a disabling factor. Sayers v. Gardner, 380 F.2d 940 (6th Cir. 1967); Miracle v. Celebrezze, supra; Franklin v. Secretary of Health, Education and Welfare, 393 F.2d 640 (2d Cir. 1968); Ber v. Celebrezze, 332 F.2d 293 (2d Cir. 1964). These cases refer to social security claims decided before the 1968 Amendment defining "impairment" as an "abnormality" which is demonstrable "by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3) (1970). In this case the chief (and only) government medical witness provided vivid and specific "clinical" evidence of the objective basis for appellant's back pain. Dr. Patterson described the X-ray appearance of appellant's spine:

X-rays of the lumbar spine showed marked degeneration of the disc between the second and third lumbar vertebra and to a lesser extent between the third and fourth; and considerable narrowing of the disc between L–4 and 5 and the lumbrosacral disc. He also has a moderately severe right lumbar roto-scoliosis marked with arthritic spurs at the center or apex of the scoliotic curve in the mid lumbar area. The opposing margins were the vertebra bodies.

Dr. Patterson then commented:

With the work in the coal mines, etc. and the type of work he has done over the period of years has produced this arthritic condition of his back. It is somewhat amazing that his back is as mobile as it is with the x-ray appearance of his lumbar spine. I can see why he would have pain in his back on flexing or twisting motion of his back. On x-ray the appearance of his back is that of a coal miner who has worked in a coal mine for 20 to 25 years.

Thus the government's medical witness furnished both clinical and opinion evidence strongly supporting Noe's testimony concerning back pain.

We believe Dr. Patterson's principal finding was "as far as any manual work, I think from a functional standpoint he is impaired as far as his low back is concerned." Significantly there is not a line of testimony that Noe's education, training and experience would allow him access to any employment other than manual work. We note, of course, that the Administrative Law Judge relied upon a different sentence from Dr. Patterson: "It is possible that this man could do very light work which would require a minimal amount of bending and lifting and *not working in one position for a long period of time."* (Emphasis added.) We find no answer to the question as to where Noe could find a job which fitted this description (particularly the portion we have emphasized) much less one which would allow him to lie down when the pain became unbearable.

Dr. Auvenshire's answer to the Administrative Law Judge's hypothetical question upon which the Administrative Law Judge rested his denial of benefits had little if any evidentiary value, since it omitted consideration of the pain and its consequences which disabled appellant.

Noe testified that the pain in his back forced him to quit his last job, that he has to use a cane to walk, that while he can stand for 45 minutes or an hour, he cannot sit down or drive a car because it "just murders my back and hip too." His testimony was that periodically during the day the pain got so bad that he could get relief only by lying down. This testimony is entirely consistent with the medical reports in this record and there is no testimony which even hints at malingering.

On review of this entire record, we find no substantial evidence to support the denial of disability benefits by the Secretary. The judgment of the District Court is reversed and the case is remanded to the District Court for entry of a judgment awarding benefits.