**Susan K. EISELER, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**Civil No. 03–73557.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2004.

Lewis M. Seward, Seward, Tally, Bay City, MI, for Plaintiff.

Sheila H. Gaskell, U.S. Attorney's Office, Detroit, MI, for Defendant.

### ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

FEIKENS, District Judge.

The Court having reviewed the Magistrate Judge's Report and Recommendation, filed on August 16, 2004, and noted that no objections were filed by either party,

**IT IS ORDERED** that the Report is accepted and entered as the findings and conclusions of this court.

*REPORT AND RECOMMENDATION*

PEPE, United States Magistrate Judge.

I. *BACKGROUND*

Susan Eiseler brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her

application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties' motions for summary judgment have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, IT IS RECOMMENDED Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED and this case remanded for further administrative proceedings consistent with this Report and Recommendation.

### A. Procedural History

Plaintiff applied for Disability Insurance Benefits on June 13, 2001, claiming disability since November 21, 2000 (R. 44). Plaintiff alleged she suffered from degenerative arthritis of the cervical and lumbar spines, a herniated disc in her neck, carpal tunnel syndrome in her wrists, and severe mental depression. Plaintiff's claim was initially denied on October 8, 2001 (R. 30). Plaintiff was represented by counsel at a hearing before administrative law judge ("ALJ") Thomas J. Walters. On March 20, 2003 (R. 216–49). Rich Riedl testified as a vocational expert ("VE") (R. 218). On April 25, 2003, ALJ Walters issued a decision denying Plaintiff's claim (R. 12–23). On July 19, 2003, the Appeals Council denied Plaintiff's request for review (R. 6–8).

### B. Background Facts

Plaintiff was born in 1950 and was 52 years old on the date of ALJ Walters' decision (R. 15, 23). She completed high school and had past relevant work experience as a school bus driver (R. 222, 223).

#### 1. Plaintiff's Hearing Testimony

Plaintiff lives in a house with her husband and her 24 year old son (R. 221). She was unemployed at the time of hearing and received $246.79 per month in retirement disability and about $430 per month for long-term (R. 222–23). Plaintiff has not worked since November 21, 2000. She worked as a bus driver for 15 years prior to that date (R. 223). She considers her job as a bus driver to be full-time and worked 30 hours per week during the school year, but not summers (R. 223–24).

Plaintiff testified that she weighed less than usual (R. 225). She attributed the weight loss to severe pain and depression, claiming it began when she was forced to leave her job (Id.). She did not drive unless it was necessary and for the most part her husband and kids drove her where she needed (Id.). When she did drive, her neck and back hurt and she does not feel it is safe on the road for herself or for others (R. 225–26).

Considering all of her conditions, Plaintiff's neck gives her the most problems and is the major factor in her inability to keep her job (R. 226). She experiences pain shooting up and down her neck and sometimes into her arms (Id.). She claims that her neck hurts any time she moves and that she "could hardly tolerate it any longer" (R. 228). She takes prescription pain pills, uses heat and ice, and lays down a lot to cope with the pain she feels everyday (R. 226–27). The medication helps, but only temporarily and has side effects of upset stomach, dizziness and drowsiness (R. 227). Plaintiff testified that while some days were better than others, at times she needed to lay down four times a day (Id.).

Plaintiff also suffers from a constant stabbing pain in her lower back that prevents her from sitting for any length of time (R. 229). Because walking makes her back feel a little better, Plaintiff walks for about 20 minutes every morning, but walking for longer periods causes difficulties (Id.). While receiving an injection for her back pain Plaintiff's spine was struck and she now suffers from tingling and numbness in her leg, which the neurosurgeon

told her was permanent (*Id.*).While she uses many treatments to dull her pain, nothing ever takes it away (R. 230).

Plaintiff also has been diagnosed with carpal tunnel syndrome. She struggles to handle anything for very long (*Id.*). While she suffers from the impairment in both hands, it is more severe in her right dominant hand (*Id.*). Plaintiff wears wrist splints to keep her wrists straight at night (R. 231).

Plaintiff also complained of depression and difficulty sleeping (*Id.*). She takes an anti-depressant three times a day and has an anti-anxiety pill she takes when she feels anxious (R. 232). Plaintiff feels she is affected by her depression every day, and she is not sure if her medication helps. She does not care about things the way she used to and is often driven out of bed by her back and neck pain, rather than a desire to do something with her day (*Id.*).

Plaintiff can only be in bed for at most three hours at a time so she gets up and goes back to bed throughout the night (*Id.*). She has little sustained sleep despite taking a sleep aid and pain pills and, therefore, she is forced to nap during the day (R. 232–33). She naps at least once, even on a good day, and naps twice most days (R. 234).

Plaintiff testified that on the average day she was up by 6 o'clock and went for a walk as soon as she got out of bed (*Id.*). She eats cereal, takes her medication, does light cleaning work, then fixes something simple for breakfast for her husband or son. She rarely does housework because her doctor told her as a rule-of-thumb to avoid doing things that cause pain. She largely relies on her kids to do a lot of her house work.

Plaintiff no longer has hobbies (R. 235). She formerly enjoyed bowling, fishing, and yard work (R. 235–36). She still spends time with her grandchildren, although she is reluctant to be alone with them because she does not feel capable of helping them if they were to need assistance (R. 236). There are few things she feels confident doing without her husband and generally feels uncomfortable leaving the home since the onset of her health problems (*Id.*).

Plaintiff complained of difficulties gripping even small items like a gallon of milk (*Id.*). She stated that Dr. Bremmer had instructed her not to pick up things without using two hands and to desist entirely if she experienced pain in her wrists (*Id.*). She does not feel comfortable sitting for more than a half hour before she requires a change in position (R. 237). Plaintiff also has difficulty standing for more than a half hour due to pain that gradually gets worse over time (R. 237–38.) She also frequently shifts her weight while standing and prefers to have something to lean on to take weight off of her lower back (*Id.*).

Plaintiff testified that she has not been pain free since the onset of her condition (R. 239). She tells doctors she is pain free when the pain is tolerable and she can move around, but she is actually still in pain during those periods (R. 238–39). She does not believe that her condition or the pain will ever go away (R. 238). Plaintiff has used various methods to help live with the pain, including injections and physical therapy (*R.239.*).

Plaintiff has not had surgery on her wrists, back or neck (R. 239). While surgery had been recommended for one of Plaintiff's hands, she wanted to consider any future procedures more thoroughly after her bad experience with the injection in her lower back that left her with numbness in her leg (R. 240). She also reported changes in the way she interacts with others (R. 241). She used to be a happy person, but that currently she felt angry and paranoid (*Id.*).

## 2. *Vocational Expert Testimony*

VE Riedl testified that although Plaintiff described her previous work as a bus driver in a manner that would indicate a sedentary exertional listing, it was not listed as such and that he felt it was properly listed as medium exertion (R. 243). ALJ Walters asked a hypothetical assuming a person who could perform light unskilled work not involving dealing with the public, a sit stand option and requiring only occasional rotation and flexion of the neck (R. 244).When asked whether such a hypothetical person could work as a bus driver and the VE testified that such a person could not (R. 243–44). With those and additional restrictions of only occasional gripping and grasping and no work around dangerous heights or moving machinery, VE Riedl did not believe there would be other jobs at the unskilled level for such a person given all the criterion included in the hypothetical the (R. 244). The ALJ then asked what limitations would need to be removed for the hypothetical person to be able to work. VE Riedl felt if either the gripping and grasping restriction were lifted or if the working with the public restriction was lifted that jobs would be available to the hypothetical person. The gripping restriction eliminated assembler, inspector and packaging jobs. (R. 244). With the restriction on dealing with the public eliminated from the hypothetical, VE Riedl identified 2,400 order clerk, 1,800 information clerk, 3,200 gas station service attendant, and 1,500 parking lot attendant jobs in Michigan's lower peninsula (R. 245).

VE Riedl testified that if Plaintiff's testimony was fully credible there were no jobs available for the hypothetical person (R. 246). The VE felt that Plaintiff's sleeping problems and the combination of the medications she was taking would preclude employment in the jobs identified (*Id.*). Plaintiff's counsel asked no questions on cross examination.

## 3. *Medical Evidence*

On May 15, 2000, Plaintiff was seen by Ming Lin Hsieh, M.D., who took x-rays of Plaintiff's cervical spine and lumbar (R. 100). Dr. Hsieh found large endplate spurs and moderate disc space narrowing of the cervical spine (*Id.*). He diagnosed Plaintiff with degenerative changes, neural foramina narrowing and reverse of lordosis (*Id.*). When examining the lumbar x-rays the doctor found mild disc space narrowing of the lumbar levels, mild endplate spurring and sclerosis and hypertrophic changes of the posterior elements (*Id.*). He diagnosed Plaintiff's lumbar area as suffering from mild degenerative changes (*Id.*).

On September 11, 2000, Dr. Hsieh performed an excretory urogram with nephrotomography [1] on Plaintiff's urinary tract(R. 101). The x-rays demonstrated no gross abnormality (*Id.*). On September 19, 2000, Lawrence J. Tyler, D.O. performed an ultrasound on Plaintiff's kidneys (R. 102). He found an irregular anechoic area measuring 2.1 × 1.2 × 1.5 cm in diameter consistent with a renal cyst on the right kidney but the left kidney appeared normal (*Id.*).

On November 21, 2000, Plaintiff was seen by David Bremmer, D.O. for a yearly exam and to discuss neck and back pain (R. 126). Plaintiff reported feeling better at the end of the previous school year and after a summer therapy for her pain (*Id.*). Yet, Plaintiff had noticed a marked increase in low back and cervical pain since

---

1. This procedure involves an x-ray picture of the urinary tract or a part thereof (e.g. the bladder or kidneys, etc.), made after the injection into the tract of a substance which casts a dense shadow, accentuating the outline of the structure. (Schmidt, J.E., M.D., *Attorney's Dictionary of Medicine*, Volume 6 TH–Z, pg. U–54, December 2002)

returning to her job as a bus driver in the fall. Dr. Bremmer concluded Plaintiff's pain was the result of degenerative arthritis of the cervical and lumbar spine with secondary cervical and lumbar strain caused by repeated trauma from bus driving (*Id.*).

In a November 28, 2000, physical therapy report to Dr. Bremmer, Jacqueline Wiley, M.S.P.T., noted that Plaintiff tolerated therapy very well (R. 106–08). Plaintiff demonstrated soft tissue tightness throughout the cervical region and tenderness throughout the entire spine with particular focus on the lumbar and cervical region (*Id.*). Plaintiff stated her pain was an 8 on a scale of 0–10, representing severe pain in her neck and 5–6 of 10 in her low back (R. 106). Ms. Wiley recommended that due to the chronic nature of Plaintiff's pain, that Plaintiff find some other type of work. She asked Plaintiff to come back for further treatment (R. 108).

On December 13, 2000, Ann Edgar, P.T.A. filed a progress note regarding Plaintiff's on-going physical therapy (R. 103). Plaintiff reported feeling 50% better in both her neck and back since beginning physical therapy (*Id.*). She had met her short-term goal of resuming a home exercise program for lumbar stabilization, along with cervical exercises (*Id.*). She had also met one of her long term goals of pain no greater than a 6 of 10 in her neck (*Id.*). Therapist Edgar stated that Plaintiff was showing moderate improvement and recommended its continuance (R. 104).

On January 8, 2001, Ms. Edgar updated Plaintiff's therapy status (R. 111). Plaintiff appeared fearful of neck and back pain during range of motion testing and she also appeared depressed (*Id.*). Ms. Edgar recommended that Plaintiff's chronic pain be reevaluated and that Plaintiff's physical therapy continue in an attempt to achieve cervical and lumbar stabilization (*Id.*).

On January 9, 2001, Dr. Bremmer saw Plaintiff to recheck her neck and back (R. 125). Plaintiff reported doing better, but the doctor noted that she still had daily pain. He concluded by ordering an MRI and continued physical therapy (*Id.*).

On January 21, 2001, Michael Bartlett, M.D., performed the MRI and found disc space narrowing at C6–7 level where there was also anterior spurring with smaller posterior spurring also noted (R. 109.). He also found small right sided herniation at C5–6 of undetermined clinical significance (*Id.*). He concluded that Plaintiff was suffering from degenerative changes at C6–7 with anterior and smaller posterior spurring and accompanied disc protrusion, along with C5–6 right sided disc herniation (*Id.*).

On February 12, 2001, Plaintiff was seen by William P. Diefenbach, M.D., on a referral from Dr. Bremmer (R. 119). Plaintiff reported pain of 8 on a scale of 10 (*Id.*). Dr. Diefenbach noted degenerative changes to Plaintiff's spine and a small disk protrusion seen laterally on the right side at C5–6 (R. 120). He recommended an electromyogram nerve conduction study (EMG) to sort out the source of Plaintiff's pain (*Id.*).

On February 20, 2001, therapist Edgar's discharge note indicated that Plaintiff's physical therapy had reached both her long and short-term goals (R. 110). Plaintiff still had pain, but reported that she was getting realistic about her condition and knew that a goal of no pain was not attainable (*Id.*). Plaintiff expressed a desire to continue her pain management at home where she had the necessary equipment (*Id.*). Ms. Edgar reported that Plaintiff had met her long-term goal of independent home exercise and pain no greater than a 2–3/10 in her neck and low back with daily activities (*Id.*).

On February 26, 2001, Blake A. Bergeon, M.D., performed an EMG of the Plaintiff's upper extremities and neck (R. 114). Dr. Bergeon reported significant delays across the carpal tunnel (*Id.*). He diagnosed bilateral carpal tunnel syndrome, moderate on the left and severe on the right side (*Id.*). He also found very mild cervical radiculopathy (*Id.*). He recommended surgery on the right hand due to the severity of the carpal tunnel syndrome (*Id.*).

On April 2, 2001, William P. Diefenbach, M.D., examined Plaintiff for her neck, right arm, and hand pain (R. 118). An MRI scan showed degenerative changes at the C5–6 level (*Id.*). Dr. Diefenbach ordered a cock-up wrist splint for severe carpal tunnel syndrome in Plaintiff's wrist and vitamin B6 therapy, requesting to see her again in a month (*Id.*).

On April 30, 2001, when again seen by Dr. Bremmer, Plaintiff was doing her physical therapy at home and that she continued to complain of daily pain radiating in her neck and low back (R. 124). He suggested restarting cervical traction, but using a lighter dose than had been used previously (*Id.*).

On May 7, 2001, Plaintiff returned to see Dr. Diefenbach. She complained of neck pain, but denied any hand pain (R. 116). Dr. Diefenbach noted that the EMG performed on Plaintiff showed the presence of bilateral carpal tunnel syndrome, but that Plaintiff did not report any symptomatology (*Id.*). He noted that Plaintiff did not appear to be responding to physical therapy and that her neck condition was in fact being made worse by cervical traction (*Id.*). He recommended that Plaintiff discard the cock-up wrist splint because her carpal tunnel syndrome she was not symptomatic of (*Id.*). He also suggested that surgery as an option, but only gave Plaintiff a 40% chance of pain relief if she underwent surgery (*Id.*).

On May 23, 2001, Wilbur J. Boike, M.D., performed an independent medical evaluation of Plaintiff for her neck and back pain and headaches, apparently for an attorney related to a workers' compensation claim (R. 121). Her carpal tunnel syndrome was only noted in passing with Plaintiff stating she had never experiences intermittent hand numbness (*Id.*). Dr. Boike did not find reason to believe that any work related events caused Plaintiff's injuries. He felt Plaintiff should be restricted in lifting more than 20 pounds and he did not see why she could not return to work as a bus driver (*Id.*).

On June 5, 2001, Dr. Bremmer examined Plaintiff to recheck her cervical disc disease, carpal tunnel syndrome, and chronic neck and back pain (R. 123). Plaintiff complained of daily pain, with some days worse than others (*Id.*). Plaintiff also reported constant pain in her right wrist (*Id.*). Dr. Bremmer changed her pain medication because it was bothering her stomach. He encouraged Plaintiff to seek treatment for her carpal tunnel syndrome (*Id.*).

Plaintiff was seen by Dr. Bremmer for a check-up on August 7, 2001 (R. 202). Her back pain had improved, but flared up when she rode in a car, held her grandchildren, or sat too long (*Id.*). She reported taking Lortab as needed for pain and felt it helped (*Id.*). She thought her mood may be improving, but it was not back to normal (*Id.*).

On September 7, 2001, Plaintiff was evaluated for the Michigan Disability Determination Service by Mark A. Deskovitz, M.A., Limited Licensed Psychologist (R. 150). Mr. Deskovitz found that Plaintiff did not appear to exaggerate or minimize symptomatology (R. 152). Her thoughts and speech were well organized and spontaneous (*Id.*). Plaintiff appeared to be very depressed and had a flat affect, but at

times was cheerful (*Id.*). She was able to recall six digits forward and five digits backward, but only able to recall two objects our of three after a three-minute interval (*Id.*). Deskovitz concluded by diagnosing Plaintiff with major depression, but stated her prognosis was fair (R. 153).

On October 23, 2001, Mary Stelma, Ph. D., met with Plaintiff who was referred to the Sparrow Regional Pain Management Center by Dr. Bergeon (R. 177). Dr. Stelma recommended that Plaintiff be scheduled for individual psychotherapy sessions to help her manage her pain and depression (R. 179). On November 6, 2001, Plaintiff was seen by Kenneth S. Rudman, M.D., at Gratiot Community Hospital's Pain Management Network for initiation of nerve block therapy recommenced by Dr. Stelma (R. 181). Dr. Rudman sedated Plaintiff and performed a cervical epidural steroid injection at C6–7 (*Id.*). Plaintiff also received a bilateral posterior cervical lumbar facet block at C6–7 (*Id.*). Dr. Rudman reported that no complications were noted (*Id.*).

On November 20, 2001, Subhash C. Gupta, M.D., at the Pain Management Network, reported a partially improved neck (R. 182). Dr. Gupta continued with the nerve block therapy. On November 27, 2001, she returned and was seen by Dr. Rudman for continued evaluation of her neck pain (R. 183). Dr. Rudman noted that Plaintiff had not seen improvement despite the three cervical epidural steroid injections (*Id.*). He scheduled two cervical facet blocks 1–2 weeks apart and planned to reevaluate Plaintiff following further treatment (*Id.*). Finally he noted that Plaintiff was experiencing numbness in her left leg, labia, and groin (*Id.*). He attributed the numbness to nerve irritation caused by the epidural and was optimistic it would resolve over time (*Id.*).

On December 11, 2001, t he injections were continued and the Dr. Rudman noted

no complications (R. 185). By December 31, 2001, Plaintiff reported significant improvement after a right cervical facet block and this treatments were continued without complication (R. 186).

On January 8, 2002, Plaintiff reported a decrease in her pain to Dr. Gupta at the Pain Management Network (R. 187). Plaintiff was no longer using her strongest pain medication, Lortab, for relief and described her pain score that day as a 0 out of 10 (*Id.*). Dr. Gupta noted that nerve block therapy would be discontinued, but that Plaintiff could call to follow up if it was needed in the future (*Id.*).

On February 27, 2002, Plaintiff was seen by Dr. Bremmer for her yearly exam (R. 204). She complained of numbness in her left groin, labia, and most of the inside of the left leg down to the foot, which had started after a cervical steroid injection (*Id.*). Dr. Bremmer increased the dosage of her Neurontin to 400mg and changed her Vioxx intake (*Id.*).

On July 17, 2002, Plaintiff complained to Dr. Bremmer that the Neurontin was not helping relieve the numbness in her leg (*R.205.*). She also reported feeling intermittent anxiety (*Id.*). Dr. Bremmer proscribed Ativan 0.5mg to be taken three times daily as needed for her anxiety (*Id.*).

When seen by Dr. Rudman at the Pain Management Network on August 13, 2002, Plaintiff complained of an increase in her neck pain that was "tolerable", but required her to take as many as six Vicodin tablets per day (R. 189). She reported no history of recent neck trauma, but yet her neck continued to get worse and her range of motion continued to decrease (*Id.*). Dr. Rudman recommended repeating diagnostic cervical facet blocks and monitoring Plaintiff's condition (*Id.*). On August 20, 2002, Plaintiff was seen by Dr. Rudman for additional cervical facet block treatment (R. 190). The procedure was completed

without complication and Plaintiff was scheduled to continue the treatment (*Id.*).

On December 12, 2002, Christopher K. Shier, M.D., performed magnetic resonance imaging of Plaintiff's cervical spine and lumbar spine (R. 196–97). The testing of the cervical spine revealed mild spondylotic changes present at C5–6 and C6–7, minimal broad based posterior bulging over the disc (R. 196). There was mild posterior disc protrusion eccentric to the right at L4–5 (R. 197).

On January 24, 2003, Plaintiff was seen be Blake A. Bergeon, M.D., for left leg numbness of an unclear etiology (R. 201). Dr. Bergeon suggested the numbness may have been a result of a cervical epidural injection (*Id.*). He noted that the numbness had been persistent for 14 months, but that it was not accompanied by associated pain or weakness (*Id.*). Dr. Bergeon concluded that there was no evidence to suggest a significant peripheral nerve component to Plaintiff's ongoing numbness (*Id.*).

## II. ANALYSIS

### A. Standard of Review

■ In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of HHS*, 757 F.2d 803, 804 (6th Cir.1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

■ If the Commissioner seeks to rely on VE testimony to carry his burden of proving the existence of a substantial number of jobs that plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the plaintiff can perform.

Under the administrative regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d); *see also* S.S.R. 96–2p. The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of [the claimant's] impairment[s]." 20 C.F.R. § 1527(d)(2).

---

**2.** *See, e.g., Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir.1987) (hypothetical question must accurately portray claimant's "individual physical and mental impairments"); *Cole v. Secretary of HHS*, 820 F.2d 768, 775–76 (6th Cir.1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir.1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary," which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity, or a general and conclusory statement of disability or inability to work. *See* SSR 96–5p.

### B. *Factual Analysis*

#### 1. *ALJ's Findings and Plaintiff's Challenges*

On his decision of April 25, 2003, ALJ Walters found in the text, but not in his formal findings, that Plaintiff had major depression that he classified as "severe within the meaning of the Regulations:(R.17)." In his formal findings he determines that the severe "impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." Yet, again he does not specifically identify them in his formal findings. He notes that she has "severe and non-severe impairments" (R. 16), and the text of his written decision suggests that because of no recent complaints of symptoms her carpel tunnel syndrome was mild and not severe, but that in addition to her depression, he considered her back and neck limitations as severe. He did not find Plaintiff "totally credible" regarding the degree of her impairments. He found her to have a "residual functional capacity to lift up to 20 pounds occasionally, with 10 pounds frequently; sit, stand or walk approximately six hours out of an eight-hour workday. Additionally, she requires work that is unskilled with a sit/stand option and only occasional rotation of the neck and no moving machinery or dangerous heights." Using Medical–Vocational Rule 202.14 as a framework for decision-making, he found a significant number of jobs Plaintiff could perform using as examples the cashier, order clerk, information clerk, self service gas station attendant, and parking lot attendant identified by VE Riedl. Thus, he found her not under a "disability," as defined in the Social Security Act.

Plaintiff raises challenges ALJ Walters' findings primarily on two grounds related to the sufficiency of the hypothetical question to VE Riedl. While the ALJ found depression to be a severe impairment, he failed to include the limitations it imposes on Plaintiff in his hypothetical. Second, Plaintiff challenges the ALJ's finding that Plaintiff's bilateral carpal tunnel syndrome does not meet the threshold requirement for a "severe" impairment.

Regarding psychological limitations, such as concentration limitations, the Sixth Circuit has held that the specific psychological limitation need not specifically be mentioned in the hypothetical question if that question adequately describes that claimant's limitations arising from a mental impairment or otherwise accommodates the limitation. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001).

Here, the ALJ seemed to have done that in his initial hypothetical question that accommodated Plaintiff's depression, as least in part, by including a restriction of "[n]o work involving dealing with the public" (R. 244). Yet, when that question led to the VE stating there were no jobs available (*id.*), the ALJ then asked the VE what restrictions he had to remove to get a different answer. The VE gave him a choice: remove the limitation on "gripping or grasping" or the restriction on "dealing with the public." (R.244–45). The ALJ removed the latter restriction and, in effect took one of the limitations of Plaintiff's depression out of the hypothetical.

Defendant argues that, contrary to Plaintiff's assertion that the severe impairment of depression was not considered, it was adequately accommodated when the ALJ limited Plaintiff to "unskilled work." Yet, as Plaintiff's counsel argues, this con-

fuses work skills with mental abilities. While work skills refer to the amount of time a job can be learned in and how much judgment a job requires (20 C.F.R. 202.1568), mental abilities include factors like understanding, remembering, and carrying out instructions. A similar issue arose in an earlier confusion of "aptitudes" with "skills."

*Weaver v. Secretary of HHS*, 722 F.2d 310, 311 (6th Cir.1983) notes:

> *Blake v. Secretary*, 528 F.Supp. 881 (E.D.Mich.1981) stands for the proposition that there is an inherent difference between "aptitudes" and "skills." An "aptitude" is an "inclination, a natural ability, talent, or capacity for learning." A "skill" is a "learned power for doing something competently." *Webster's Ninth New Collegiate Dictionary.* In short, an aptitude is an innate ability while a skill is a learned ability. Compare 20 C.F.R. 404.1521(b) with 20 C.F.R. 404.1565 and 404.1568.

Later, *Cole v. Secretary of HHS*, 820 F.2d 768, 773 (6th Cir.1987), citing Weaver made a similar distinction:

> An aptitude is an inclination, natural ability, or capacity to learn; a "skill" is a learned ability to do a specific job. * * * We have found, for example, that independence of judgment, responsibility for a work product or production standard, ability to use hand tools, and manual dexterity are aptitudes rather than transferable skills.

(Citations omitted.)

Thus, a skill is different not only from an innate aptitude, but also different from various innate psychological limitations. Courts have found that hypotheticals limiting a worker to "unskilled work" have not been sufficient to accommodate certain psychological limitations. *Newton v. Chater*, 92 F.3d 688 (8th Cir.1996), held that a reference merely to "unskilled sedentary work" in a hypothetical question is insuffi-cient to describe and accommodate concentration deficiencies; *see also McGuire v. Apfel*, 1999 WL 426035, at *15 (D.Or.1999). This Court in *Bielat v. Comm'r of Soc. Sec.*, 267 F.Supp.2d 698 (E.D.Mich.2003) (quoting *Andrews v. Comm'r of Soc. Sec.*, No. 00–75522 (E.D.Mich. Dec. 18, 2001)) and citing *Thomczek v. Chater*, 1996 WL 426247 (E.D.Mich.1996), has held that a hypothetical question including "unskilled sedentary work" plus the limitation of "jobs low at the emotional stress level" is not sufficient to accommodate a finding of a "marked" limitation in ability to concentrate or persist at tasks.

■ Thus, it cannot be said that limiting Plaintiff to "unskilled work" is an adequate accommodation of her limitations involving severe depression. Given this, the VE's response to the flawed hypothetical cannot constitute substantial evidence to uphold the Commissioner's finding that Plaintiff can perform substantial work. *Walker v. Barnhart*, 258 F.Supp.2d 693 (E.D.Mich. 2003) (an explicit finding of a severe mental condition requires it to be included in the hypothetical question to the VE.)

Plaintiff's second challenge is to ALJ Walters' finding that her bilateral carpal tunnel syndrome was not severe within the meaning of the Regulations. The ALJ states that Plaintiff has denied symptomatology related to her carpal tunnel syndrome and that it therefore had no more than a minimal effect on her ability to perform basic work activities and was not severe. Plaintiff was asymptomatic in May 2001, when she saw Dr. Diefenbach and apparently when she saw Dr. Boike. Yet, Plaintiff reported pain on April 2, 2001 (R. 118), again on June 5th 2001 (R. 123), and during the hearing (R. 230–31). An ALJ is to consider the "record as a whole" and a single month of no complaints concerning her wrist is thin evidence on her carpel tunnel syndrome not being severe, when considered in light of

he significant evidence, including EMG testing, that she did have a mild to moderate problem that likely would limit her in some jobs and thus qualify as severe. ALJ Walters should have included Plaintiff's carpal tunnel syndrome in his list of her severe impairments, yet he seem to have taken Plaintiff's carpal tunnel syndrome into account when he included a restriction regarding "gripping and grasping" in his hypothetical to the VE.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir.1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir.1994), held that after finding reversible error it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir.1985).

■ In this case "all essential factual issues" have been *not* been resolved with regard to impact of Plaintiff's depression on her vocational capacity. Nor is the current case one where "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." Accordingly, a remand for further administrative proceedings consistent with this Report and Recommendation is necessary.

III. *RECOMMENDATION*

For the above stated reasons IT IS RECOMMENDED that Defendant's motion be DENIED and Plaintiff's motion be GRANTED and this case remanded for further proceedings consistent with this Report and Recommendation.

Either party to this action may object to and seek review of this within ten days as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir.1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

August 16, 2004.